## PREFERENCES UNDER THE OLD LAW.

[Circuit Court of Huron County.]

FIRST NATIONAL BANK v. H. G. LEISE ET AL.

Decided, 1901.

*Chattel Mortgages—Executed Prior to the Cohen Law, and on the Eve of Assignment—Mortgagees Could Legally Take Possession of the Property—Notes Discounted in Bank—Not Extinguished by New One Day Notes Secured by Mortgage, When.*

1. Chattel mortgages given to secure *bona fide* debts were not invalid under Section 6343 prior to its amendment (93 O. L., 290), and did not constitute the agent of the mortgagees, who took possession of the property, a trustee for the benefit of all the creditors.
2. The making of new one day notes, secured by mortgage on the maker's stock of goods, to take the place of former unpaid notes to the same payees, which had been discounted in bank and which the payees promised to return to the debtor, did not extinguish the indebtedness, and gave under the mortgage no advantage to other creditors than the payees.

HAYNES, J.; MOONEY, J., and HULL, J., concur.

This action was brought here by appeal from the court of common pleas. Action was brought in that court for the purpose of setting aside certain transfers of property and to declare a trust for the benefit of all creditors under Section 6343, Revised Statutes, and extending under Section 6344. The proper issues were made up from the pleadings and the case has been heard upon the evidence, and upon the argument of counsel.

Briefly, it appears that J. L. Hudson, prior to 1894, or about that time, had been carrying on the business in this city of selling ready-made clothing, and about that time he desired to withdraw from the business here. Mr. Leise had been in his employ for some time, here and at Detroit, and knew him well and he desired to purchase the goods and remain here and carry on the business; and such negotiations were had that Hudson sold out to him for something like $2,200 and took notes for that amount

*Dismissed in the Supreme Court for failure to file printed record.

payable at a future time, but with a separate arrangement in writing between the parties that Leise might pay $75 per month until the amounts were paid.

Leise desired to enlarge the business, or rather to extend it and to carry on the business of selling dry goods, and for that purpose it was necessary for him to purchase from merchants dry goods, and he sought to purchase from certain firms in Detroit, the firm of Strong, Lee & Company and Edson, Moore & Company, and I believe he purchased from some other firms at other points.   To enable him to do so, Mr. Hudson entered into a guaranty with these respective parties, guaranteeing the amount of the goods that each might sell him, up to a certain amount. They made sales to him payable at a future time, and the business was carried forward by Mr. Leise for a period of perhaps eighteen months.   The business did not prove remunerative.  His sales were light and his expenses were a little large and he found himself in a failing condition.

It appears from the testimony that he had told Mr. Hudson at the time he gave this guaranty for the payment of these goods and perhaps before that time, that he would protect him in case of any financial trouble.   In carrying on the business he has created some other indebtedness, he had borrowed money of friends of those that were rather intimate with him and had created some indebtedness for goods and had borrowed money from the First National Bank of Norwalk for the purpose of carrying on his business the sum of $1,500 or $2,000, which was still due and owing.

Finding himself in this position, he notified Mr. J. L. Hudson, or rather the agent of Mr. Hudson in Ohio, who lived at Sandusky, Mr. Hicks—Mr. Hudson himself living at Detroit—that he would have to stop business.   Thereupon Mr. Hudson came to Ohio and appointed a meeting with Mr. Liese and Mr. Hicks, his manager, at Cleveland, at the office of a firm of lawyers, and there it was arranged and agreed and carried out, so far as it could be, that mortgages should be executed to Mr. Hudson and to some of these other creditors for the purpose of securing them to the amount that he was owing to each.   It seems that at the same time there was a deed of assignment drawn up

whereby an assignment was to be made after the filing of the mortgages to a trustee for the benefit of creditors. This was done on Sunday afternoon, on February 9, but all papers were dated February 10. Mortgages were given to each of the creditors—a mortgage to Hudson, to Strong, Lee & Company, to Edson, Moore & Company and some others.

The mortgages contained a condition that the mortgagees should take immediate possession of the stock of goods. There were also executed, at the same time, notes payable one day after date, direct to the mortgagees.

The next morning Mr. Leise returned home, and Mr. Hicks and Mr. Loeser came here, Mr. Loeser being an attorney from Cleveland.

It had been agreed that Mr. Hicks was to be the man who was to take possession of the stock of goods for the mortgagees, and Mr. Hudson returned to Detroit for the purpose of seeing the parties in regard to that matter. He did see them in the morning and it was agreed by them, or consented to by them, that Mr. Hicks might act as their respective agent in taking possession of the stock of goods under the mortgages; and that was done, as the testimony shows, before a final consummation of the arrangement by the filing of the mortgages. He took possession of the stock of goods and the mortgages were then filed in the recorder's office in this county.

Shortly after, Mr. Hicks, as the agent of the mortgagees, took possession of the stock of goods and closed the door, or about the same time the deed of assignment was signed and executed and Mr. S. M. Young of this city was named as assignee, and that paper was filed in the office of the probate court and Mr. Young went to the store and demanded possession of the stock of goods under it, but he was told that he could not have it and was allowed to remain outside of the building, and within three or four days this suit was commenced. Hicks, in the meantime, after closing the store, was proceeding to take an invoice of the stock of goods. That stock of goods, either by agreement or under an order of the court, has been sold, and the money is in the hands of a trustee awaiting the action of the courts in regard to these mortgages.

It transpired from the evidence which was brought out upon examination, that J. L. Hudson had received notes originally; and, in the course of business, had transferred them to a bank, for his own convenience, raising the money on them to be used in his business, and that Strong, Lee & Company and Edson, Moore & Company had done the same thing.

I believe that comprehends substantially all the facts that are material to the case.

It is intimated here that this transaction operated as a fraud upon the other creditors. That the effect of it was to entirely deprive them of any part in the proceeds of the stock of goods, is true, and we suppose their debt still remains wholly unpaid and will be unpaid unless Mr. Leise at some time should be able to make money enough to pay them.

That there was actual fraud, in that there was an agreement at the time of the original transfer of the stock of goods to sell same and pay the indebtedness to Hudson, restock by purchase on credit and thus take the proceeds for the benefit of J. L. Hudson, is not claimed, nor is it shown by the evidence. We think the evidence shows that Mr. Hudson was willing to allow this clerk of his to try his hand at carrying on the business, but that he had some doubts whether he would be successful, and as the matter proceeded, perhaps had still more doubt; but he was willing to give him time and did give him time, and he allowed his installments of payments to pass at times unpaid. He assisted him to buy goods and incurred indebtedness on his paper for the purpose of enabling him to carry on his business, a fact which we conceive to be wholly inconsistent with actual intent of fraud on the part of Mr. Hudson. So that at the time that Mr. Leise had given notice that he would carry on the business no longer, the matter simply stood in such a manner that the transaction to be carried out, or whatever was to be done, was to take such legal steps as would prefer or protect Mr. Hudson and those other parties in accordance with the statement of Leise previously made that he would do so. That we conceive makes no special difference.

The question is, whether or not this matter of taking these preferences is illegal in the state of Ohio; whether the manner

in which it was taken is illegal, or would render it obnoxious to any provision of the statutes in this state.

That possession taken under these mortgages could not make Mr. Hicks a trustee is clearly settled by a decision of the Supreme Court of this state, a decision that has been in force for forty-two years and has been approved and never disputed by the Supreme Court of this state, and that is the case of *Justice* v. *Uhl,* 10 Ohio St., 170, where claims being in the hands of Convers, Giddings & Bigelow, a firm of lawyers then doing business in Sandusky, they had taken mortgages to the separate creditors and had taken possession of the stock of goods as agents for those creditors; the Supreme Court said that that was perfectly lawful and right and did not make it obnoxious to any statute of the state of Ohio, and the present statute I understand was in force at the time, or one similar to it. So the taking possession of this stock of goods by Mr. Hicks as agent of these separate mortgagees, did not constitute him a trustee for the benefit of all the creditors.

The question was somewhat discussed and the question is in the case, whether or not the making of these mortgages and the assignment to a trustee at substantially the same time, would or could or should operate as an assignment in trust for the benefit of all the creditors.

In *Sylvester* v. *Hesslein,* 5 C. C., 256, this court, sitting in Lucas county, composed at that time of Judges Bentley, Scribner and myself, had that question before us. The question had been decided by some other circuit courts, and there had been perhaps three of them that had passed upon the question, and others, I think, were getting ready to.

In that case Hesslein, who was carrying on business at Toledo, a dry goods business, was pressed by a Chicago creditor for payment, or for security, and she executed to him a chattel mortgage on her stock of goods and allowed the creditor to take possession; she then, without being pressed or solicited in any manner, gave mortgages to sundry of her other creditors and caused them to be delivered or filed by their agents, subject to this prior mortgage and the taking possession under that mortgage; then she made an assignment of all her stock of goods to Mr. Black,

of the city of Toledo, subject to his mortgage, and he wrote an acceptance, but it was never filed in probate court, and he never acted upon it in any manner. The party who held the first mortgage proceeded to sell the stock of goods and they were going to divide the proceeds between themselves, but the creditors intervened and filed their petition, and the matter then came up for hearing. We held that, in that case, as far as the Chicago creditor was concerned, that he, being an adversary party and pressing for a mortgage, had the right to hold his mortgage, and that as to all the other mortgagees, it being a voluntary matter on the part of Hesslein, and an assignment having been made substantially at the same time, that same was an assignment in trust for the benefit of all the creditors; and we directed that the matter be sent to the probate court for the appointment of a trustee for carrying out all the purposes and objects of the trust.

The case was never taken up; the matter was settled immediately by the parties and the case ended. We decided that case in 1891. We thought that good law and we have never gotten away from that position. But the Supreme Court, however, the next year, took a different view of the matter and in *Cross* v. *Carstens*, 49 Ohio St., 548, 566, discussed the matter very fully. The case came up from Cincinnati, and perhaps these various decisions coming from the circuit courts of the state, the question having been before the courts throughout the state, they deemed it advisable to pass upon the question. The question was in the case, possibly, although they might have decided the case upon another point alone, but as the question was in the case, they saw fit to decide it, and it is in fact a decision of the Supreme Court of Ohio upon a point that was made in the case which was before them and which they might properly decide; and they say, speaking of the decision such as we had made:

"This doctrine has been confidently argued by eminent lawyers and has recently received the sanction of at least one Ohio court of high standing, perhaps of more than one. There is about it a spice of the heroic which challenges admiration, though it may not win acquiescence. Indeed, we may confess that when first presented we were attracted to the doctrine. But reflection has satisfied us that it is consistent neither with a fair interpre-

tation of the statutes, nor with the previous decisions of this court, and, as an attempted rule of property, would prove unsubstantial and delusive, and practically impossible of execution.''

Thereupon they proceed to establish and hold a contrary doctrine for the state of Ohio. They say for fifty years or more, in the state of Ohio, almost from the earliest establishment of the courts, the doctrine that a man might dispose of his own property as he saw fit, for the purpose of preferring creditors, was right; that it was held by him, and was a right which was proper for him to exercise and a right in which he had been sustained from time to time by the courts, and in which, in this decision, they sustained him.

So that, under the decision of the Supreme Court, there could be no question but that this party had the right to make these mortgages. The mortgagees had a right to take possession under those mortgages and they had a right to hold their property, although the effect of it was to deprive other creditors equally meritorious, of any right or share in the distribution of the property, and to leave them entirely without security for their indebtedness, and that the deed of assignment did not deprive them of that right.

Now, there was another complication that came into the question that is raised here, and that is this: As I have said, it appears that these various creditors had, in the course of their business, negotiated notes at the bank and had taken the proceeds and had applied them to the uses and purposes of their business in their regular course of business.

In other words, in carrying on their business, they used all their notes that came in that way and discounted them and carried along the debt for the time, and if the notes were not paid by the debtor, then they took them up themselves.

Reference is made to the case of *Pendery* v. *Allen*, 50 Ohio St., 121. In that case Emerson had become surety for some parties by the name of Rowe. Allen owed to the bank in Cincinnati the sum of ten thousand dollars. The Rowe notes were eight thousand dollars. Emerson took a mortgage from Allen to secure himself upon his endorsement, and at the same time agree-

ing to pay to Rowe the amount of their notes, and also at the same time agreed to pay the bank the note that was owing by Allen to the bank upon which Emerson, prior to that time, had not been liable.

The Supreme Court held that in doing that he had rendered himself, or brought himself under this statute; that the transaction should be declared an assignment in trust of the property for the benefit of all the creditors. In other words, that in receiving the mortgage and in taking the steps that he had, that he had received property from a failing debtor in contemplation of insolvency in trust for himself and for others, and that in doing so, the statute would step in and declare the trust a trust for the benefit of all creditors.

They recognized the right of Emerson to secure himself as an endorser upon that paper. The court say, page 132:

"He might safely have secured his liability for Allen to the Rowes; but, having gone beyond this, and accepted a mortgage intended to secure another creditor, he became by force of the statute a trustee for all, and in respect to all the property covered by the mortgage. * * * And his liability in this regard is to be determined not by subsequent events, but by the nature of the transfer at the time it was made. If, by its terms, or necessary implication, it made him liable to account to another creditor of the debtor, it is an assignment in trust within the meaning of the statute."

They argued as far as the bank was concerned, that having received this property upon the agreement that he would pay that debt, the bank would have the benefit or the right to come in and compel him to account to it for the property that he had received.

Now that transaction and this are different, and when we come to reflect upon it, they are quite different. These parties were creditors of Leise; they had sold him goods and had claims against him for the price of those goods. It is true that he had given them notes to the amount of the price of those goods although the notes didn't pay the account. The account still existed and existed for all time and does exist to-day, because it is not yet paid.

In *Merrick* v. *Boury,* 4 Ohio St., 60, the Supreme Court say:

"It is only by force of an agreement of the parties that the giving of an unsealed note by the debtor will be payment of a precedent debt. The burden of proof is upon the debtor, who must establish the agreement clearly; and the question whether there was such an agreement is one of fact to be determined by the jury."

There is no proof and no way whereby it can be known that there was ever any agreement that these notes were to be taken by the parties as payment of that account; that account existed all the time and still exists. The notes that were taken by the parties were by them, in the course of their business, transferred to the bank simply to raise money to be used in their business. They never applied that money to the payment of the account. They could not do so. It was not what they were negotiating the notes for. They were negotiating the notes simply to carry on their business, and to pay their debts, and to purchase goods in their business.

When they came to take these mortgages, they took the mortgages to secure that debt. It is true, when they came to do it, they chose to put it in the form of a note payable at one day, with the understanding that the other notes should some time be returned to the debtor; but the thing that they were doing, the real transaction was, that they were securing the debts of these respective creditors which have never been paid in any manner or form. They never took those mortgages, in any way or form, with the understanding that anybody else was to be benefited by them, and the payment of those notes to the banks, held by them respectively, did not pay the debts due from Leise that still existed.

With this statement of facts and this discussion of the law of the case, as we think, in all its material aspects, we are wholly unable to see wherein the plaintiff has any right to set aside the transfers that were made by Leise to these parties, by virtue of those mortgages or to declare them void in any manner or form by the law of the land, as it existed at the time of the transaction. Each of these respective creditors have, we think, without doubt, the right to hold this property and to apply it

upon the payment of their respective mortgages according to their respective rights and equities.   In saying this, we do not wish to say that we approve of the statute as it has stood for fifty years in this state.   We have held, and we believe that the rule is, that equality is equity, and we rejoice that the Legislature of the state has finally passed a law which prevents any transfers of the character of these now before us.   But inasmuch as this transaction occurred prior to that law, and where the law in force was as I have already stated it, we are compelled to announce and to adjudge that the mortgagees have the right to hold that property, and we so order.

*C. L. Kennan* and *S. M. Young,* for plaintiff.

*C. P. & L. W. Wickham,* for defendants.